UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

JULIE EVANS,                              :
                                          :
    *Plaintiff/Counter-defendant*,      :
v.                                        :        No. 1:04-cv-44
                                          :        *Edgar*
METROPOLITAN LIFE INSURANCE                :
COMPANY, d/b/a METLIFE,                    :
                                          :
    *Defendant/Counter-plaintiff*.      :


**MEMORANDUM**

**I.**    **Introduction**

On February 11, 2004, plaintiff Julie Evans ("Evans"), brought this action [Court File No. 1]

against defendant Metropolitan Life Insurance Company d/b/a MetLife ("MetLife"), alleging improper

denial of disability income benefits pursuant to 502(a)(1)(b) of the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 (a)(1)(B).   Further, in its Amended Answer [Court

File No. 17, 21], MetLife has set forth a counterclaim against Evans alleging that it overpaid her

$2,576.97 in long-term disability benefits as the result of the award of retroactive Social Security

disability benefits.

Currently pending before the Court are: (1) Evans' motion for a judgment on the

administrative record [Court File No. 26] and (2) MetLife's motion for a judgment on the

administrative record. [Court File No. 28].   These motions are now ripe for review.

After a review of the record and pleadings, the Court concludes, for the reasons set forth in

detail, *infra*, that Evans' motion for a judgment on the administrative record [Court File No. 26] will

-1-

be **GRANTED** and MetLife's motion for a judgment on the administrative record [Court File No. 28]

will be **DENIED**.

## II.    Background

Evans, a resident of Delano, Tennessee, was employed by Peyton's-Southeastern, Inc. and

the Kroger Company ("Kroger/Peyton's") as an inventory control supervisor. [Court File No. 1, ¶ 3].

As an employee of Kroger/Peyton's, Evans was a participant in the Kroger Company Long Term

Disability Plan ("Plan"). [Court File No. 17, ¶ 1].

Evans began her employment at Kroger/Peyton's on March 22, 1999. [Court File No. 16,

Administrative Record, ("A.R.") 109, 132].   Throughout her employment at Kroger/Peyton's Evans

was a participant in the Plan.  MetLife served as the claims administrator responsible for administering

claims for long-term disability ("LTD") under the Plan.   MetLife had also issued a group insurance

policy to fund the Plan.  *Id.*, A.R. 208, 210.

The Plan defines disability as follows:

"Disabled" or "Disability" mean that, due to sickness, pregnancy or accidental
injury, you are receiving Appropriate Care and Treatment from a Doctor on a
continuing basis; and

1.      during your Elimination Period and the next 24 month period, you are
unable to earn more than 80% of your Predisability Earnings or
Indexed Predisability Earnings at your Own Occupation for any
employer in your Local Economy; or

2.      after the 24 months period, you are unable to earn more than 60% of
your Indexed Predisability Earnings from any employer in your Local
Economy at any gainful occupation for which you are reasonably
qualified taking into account your training, education, experience and
Predisability Earnings.

Your loss of earnings must be a direct result of your sickness, pregnancy or
accidental injury. Economic factors such as . . . recession, job obsolescence, paycuts
and job-sharing will not be considered in determining whether you meet the loss of
earnings test.

-2-

*Id.* A.R. 186-87. The Plan also sets forth a Benefits Checklist which states in relevant part:

> In order to receive benefits under This Plan, you must provide to us at your expense, and subject to our satisfaction, all of the following documents:

> ✓      Proof of Disability.

> ✓      Evidence of continuing Disability.

> ✓      Proof that you are under the Appropriate Care and Treatment of a Doctor throughout your Disability.

> ✓      Information about Other Income Benefits.

> ✓      Any other material information related to your Disability which may be requested by us.

*Id.*, A.R. 183.

> Furthermore, the Plan also sets forth limits for disabilities based upon particular conditions:

> **Limitation for Disability due to . . . (ii) Neuromusculoskeletal and Soft Tissue Disorder . . . .**

> 24 Monthly Benefits in your lifetime, or the Maximum Benefit Duration, whichever is less. Benefits may be paid beyond 24 months as described in the provision, subject to certain requirements.

*Id.*

> Neuromusculoskeletal and soft tissue disorder is defined in the Plan as:

> . . . including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless the Disability has objective evidence of:

> a.      seropositive arthritis;

> b.      spinal tumors, malignancy, or vascular malformations;

> c.      radiculopathies;

> d.      myelopathies;

> e.      traumatic spinal cord necrosis; or

f.        musculopathies.

*Id.*, A.R. 195.

Further, the ERISA information lists The Kroger Co. as the Plan Administrator and it describes the type of administration as " . . . benefits are insured by Metropolitan Life Insurance Company ("MetLife"). *Id.*, A.R. 205. The Introduction to the Plan Document states, however, that "[t]his booklet specifically describes the benefits available under the Long Term Disability Plan insured and administered by MetLife. The benefit is made available to eligible employees under the terms and conditions of the Kroger Co. Health and Welfare Benefit Plan . . . ." *Id.*, A.R. 175. Thus, a careful reading of the Plan documents leads to the conclusion that although the Kroger Co. is the Plan Administrator of the Kroger Co. Health and Welfare Benefit Plan, MetLife is both the plan administrator and insurer of the LTD Plan which is the subject of this action.

Finally, the Plan documents give MetLife discretion to interpret the terms of the plan and determine eligibility for benefits under the Plan. The Plan documents state:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

*Id.*, A.R. 210.

Evans has a condition known as thoracic scoliosis. [Court File No. 1, ¶ 1]. According to Evans, although the disease has been present throughout much of her life, it was essentially asymptomatic until early in the year 2002. *Id.* At that time, Evans alleges that she began experiencing severe pain, difficulty moving and numbness, which, she alleges, became so pronounced as to become disabling as of mid-March 2002. *Id.*

-4-

At the end of her elimination period under the Plan, Evans filed a claim for LTD benefits. *Id.* at p. 2. MetLife approved Evans' eligibility for benefits on October 22, 2002. [Court File No. 16, A.R. 46]. In MetLife's letter approving Evans' claims for LTD benefits, MetLife noted that the 180-day elimination period had been satisfied and benefits became payable on September 15, 2002. *Id.*

The letter also states in pertinent part that MetLife

> . . . had your file reviewed by an Independent Physician Consultant Board Certified in Internal Medicine and Infectious Diseases. On October 22, 2003, a copy of this review was sent to Dr. Watters. We request Dr. Watters respond to the consultant's findings by November 11, 2002. We ask that you follow up with Dr. Watters to ensure that response is provided on your behalf. If there is no response we will presume your doctor is in agreement with the consultant's report.

*Id.*, A.R. 47.

Subsequently, on December 17, 2002, MetLife sent Evans a letter stating that her claim for LTD benefits has been "approved for benefits from September 15, 2002 through December 21, 2002." *Id.*, A.R. 38. MetLife's reasons for the termination of Evans' LTD benefits as of December 21, 2002, were set forth in the December 17, 2002 letter as follows:

> An Independent Physician Consultant certified in Internal Medicine and Infectious Diseases reviewed your file. The results of the consultant's review were sent to Dr. Watters for review. Dr. Watters did not comment, but instead requested that the consultant's report be forwarded to Dr. Hauge for review because you are currently under his care.
>
> Dr. Hauge states he concurs with the consultant's review and that you have the ability to return to work in a sedentary position with restrictions and limitation of occasionally lifting up to 20 pounds and very little bending.
>
> Your employer advised that they are able to accommodate the restriction and limitations above, indicating that there are other employee's [sic] who can do any lifting you feel is beyond your capacity.

*Id.*, A.R. 39.

Evans appealed MetLife's denial of her claim for LTD benefits. On February 11, 2003, MetLife upheld the termination of her LTD benefits as of December 21, 2002. MetLife's letter upholding the denial of benefits gives the following reasons:

> Your record reflect that you were last at work on March 15, 2002. You worked as an Inventory Control Supervisor. You have remained out of work due to Thoracic Scoliosis.

> Your medical records indicated that you had been under the care of Dr. David Hauge, a neurologist. In a note dated September 9, 2002, by Dr. Hauge, the examination found normal cognitive and cranial nerve examinations. The MRI showed no major disk herniations and no fractures.

> On November 20, 2002, Dr. Hauge reported that you had the ability to return to work in a sedentary position with restrictions and limitations. Your employer advised us that they could accommodate the restrictions and limitations posed by Dr. Hauge.

> It should be noted that we received no documentation or medical rationale to support your inability to perform your own occupation beyond December 21, 2002.

> On appeal, you submitted a letter stating that the letter from Dr. Watters dated December 24, 2002, states your condition and prompt payment of your benefits should be made.

> In our ongoing review of your claim, we had your file reviewed by an independent physician consultant, who is Board Certified in Occupational Medicine and Internal Medicine.

> The physician consultant noted that there is no evidence of spasticity of the lower extremities or other findings to suggest that you have significant compression of the spinal cord.

> The physician consultant noted that he agrees that you do need to have some restrictions with regard to work activities particularly in lifting and bending repetitively. As your employer is capable of accommodating these restrictions, you are capable of performing in the workplace.

> Based on all the above information, we must uphold the termination of your long-term disability benefits beyond December 21, 2002. We have not received appropriate medical documentation of a continuing disability. Therefore, the original claim determination was appropriate.

> . . . You have exhausted your administrative remedies under the Plan, and no further appeals will be considered.

*Id.*, A.R. 14-15.

Despite MetLife's statement that no further appeals would be considered under the Plan, Evans, through counsel, requested reconsideration of the denial of her LTD benefits in a letter dated October 6, 2003. *Id.*, A.R. 1. Attached to Evans' letter was the decision of an Administrative Law Judge ("ALJ"), dated August 27, 2003, which found Evans disabled and entitled to Social Security Disability benefits based upon her scoliosis. *Id.*, A.R. 2-12.

In her letter of October 6, 2003, Evans requested that MetLife consider the favorable decision of the Social Security ALJ and "advise if you will reverse your decision to deny benefits . . ." *Id.*, A.R. 1. There is no evidence in the record which indicates that MetLife ever responded to Evans' letter of October 6, 2003.

III.    **Evans' Motion for a Judgment on the Administrative Record** [Court File No. 26]**; and MetLife's Motion for a Judgment on the Administrative Record** [Court File No. 28]

In her memorandum in support of her motion for a judgment on the administrative record [Court File No. 27] Evans asserts that MetLife's decision denying her LTD benefits under the Plan is arbitrary and capricious because it was rendered under a conflict of interest, is unsupported by substantial evidence in the administrative record and is inconsistent with the terms of the Plan. *Id.*, pp. 19-24. More specifically, Evans asserts: (1) that she is medically unable to perform the duties of her position/occupation at Kroger/Peyton's, *id.*, pp. 2-4; (2) that MetLife's reliance on Kroger's willingness and ability to accommodate the limitations imposed by Evans' thoracic scoliosis is arbitrary and capricious, *id.*, pp. 4-8; (3) that MetLife's reliance on the opinion/assessment of Dr. Hauge is arbitrary and capricious, *id.*, pp. 9-11; (4) that MetLife's use of surveillance during the period of the appeal

determination is arbitrary and capricious, *id.*, pp. 12-14; (5) that Evans is disabled under the terms of the Plan because her scoliosis prevents her from performing any occupation, *id.*, pp. 15-16; (6) that Evans condition is not a pre-existing condition as those terms are defined by the Plan, *id.*, 16-17; (7) that Evans condition is not limited to a 24-month period under the terms of the Plan, *id.*, 17; (8) that MetLife's refusal to consider the favorable disability decision of the Social Security ALJ is arbitrary and capricious, *id*, p. 17-19; and (9) Evans does not owe MetLife for reimbursement for an overpayment based upon her receipt of Social Security Disability benefits, *id.*, pp. 19-20.

In its motion for a judgment on the administrative record [Court File No. 28], MetLife contends that its decision terminating Evans' LTD benefits as of December 21, 2002 was not arbitrary and capricious. *Id.*, pp. 1-2. More specifically, MetLife contends that its decision that Evans was no longer entitled to benefits under the terms of the Plan was reasonable and supported by substantial evidence in the administrative record. *Id.*

A. **ERISA Standard of Review**

"An employee may challenge a benefit eligibility determination under 29 U.S.C. § 1132(a)(1)(B)." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). However, it is the employee's "burden to show that he was entitled to the 'benefits . . . under the terms of his plan.'" *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)(citing 29 U.S.C. § 1132(a)(1)(B).

It is a general principle of ERISA law that a plan administrator's denial of benefits is subject to *de novo* review, "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003)(quoting *Wilkins v. Baptist Healthcare Sys. Inc.*, 150

F.3d 609, 613 (6th Cir. 1998)(citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989)). When the Plan documents give the plan administrator discretionary authority to determine benefits, the plan administrator's decision to deny benefits will be reviewed "under the 'highly deferential arbitrary and capricious standard of review.'" *McDonald*, 347 F.3d at 168-69 (quoting *Yeager*, 88 F.3d at 380).

As noted previously, the plan documents at issue here state that "[i]n carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan . . . ." [Court File No. 16, A.R. 210]. Thus, the Court concludes that MetLife's decision to terminate/deny LTD benefits under the Plan to Evans as of December 21, 2002, is subject to the arbitrary and capricious standard of review because the Plan documents give MetLife discretion to interpret the terms of the Plan and determine eligibility for benefits under the Plan.

The arbitrary and capricious standard of review is used "in order to avoid 'excessive judicial interference with plan administration.'" *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)(citing *Cook v. Pension Plan for Salaried Employees*, 801 F.2d 865, 870 (6th Cir. 1986)(quoting *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir.), *cert. denied*, 464 U.S. 829, 104 S. Ct. 105, 78 L.Ed.2d 108 (1983)). When using the arbitrary and capricious standard to review the denial of benefits under an ERISA plan, the Court is "required to consider only the facts known to the plan administrator at the time he made his decision." *Yeager*, 88 F.3d at 381 (citing *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991). Further,

> . . ."the highly deferential arbitrary and capricious standard of review." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996); *see Firestone Tire Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989) . . . "is the least demanding form of judicial review of administrative action . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry v. United Food & Commercial Workers Dist. Unions 405 & 422*, 64 F.3d 238, 241 (6th Cir. 1995)(citations and internal quotation marks omitted). Thus, the standard requires that the decision "be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Baker v. United Mine Workers of America, Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

*Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998). "An ERISA benefit plan administrator's decisions on eligibility for benefits are not arbitrary and capricious if they are 'rational in light of the plan's provisions.'" *Yeager*, 88 F.3d at 381 (quoting *Miller*, 925 F.2d at 984 (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.), *cert. denied*, 488 U.S. 826, 109 S. Ct. 76, 102 L.Ed.2d 52 (1988)).

Finally, although the arbitrary and capricious standard is highly deferential, such deference "'need not be abject,'" and "'[d]eferential review is not no review.'" *McDonald*, 347 F.3d at 172 (citing *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)(quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996)). Rather, review under the arbitrary and capricious standard

> . . . inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence – no matter how obscure or untrustworthy – to support a denial of a claim for ERISA benefits.

*Id.* (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774-75 (7th Cir. 2003)).

## B. Conflict of Interest

In her brief on appeal, Evans argues, relying on the decision in *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998), that because MetLife is both the Plan Administrator and the insurer who issued the policy which provides LTD benefits under the Plan, MetLife has a conflict of interest. [Court File No. 26, p. 20]. Evans contends that pursuant to *Killian*, this conflict of interest on the part of MetLife is a factor which this Court should take into consideration in assessing whether or not MetLife's decision to terminate/deny her LTD benefits was arbitrary and capricious.

In *Killian*, Healthsource funded and administered the ERISA plan at issue. *Killian*, 152 F.3d at 521. The Sixth Circuit described the situation as a conflict of interest and stated that such conflict was a factor to be weighed in determining whether the plan administrator's decision was an abuse of discretion. *Id.* (citing *Bruch*, 489 U.S. at 109, 109 S. Ct. 948).

A conflict of interest, however, "if present does not 'alter the standard of review.'" *Wages v. Sandler O'Neill & Partners, L.P.*, 37 Fed. Appx. 108, 113, 2002 WL 339221, * 3 (6th Cir. 2002)(quoting *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998). The *Wages* court noted that a reviewing court should take a conflict of interest into account in determining whether a plan administrator's decision was arbitrary and capricious, but that such a factor should be applied "only where there is 'significant evidence' that the insurer was motivated by self-interest." *Id.* (quoting *Peruzzi*, 137 F.3d at 433).

While this Court notes that Evans is correct that MetLife has a potential conflict of interest, the Court finds that she has failed to adduce significant evidence that MetLife was motivated by self-interest in its decision to deny/terminate her LTD benefits. Thus, the Court finds that MetLife's potential conflict of interest is not a factor which the Court is required to take into account in

-11-

determining whether its decision to deny/terminate Evans' LTD benefits was arbitrary and capricious. *Id.*

**C.**    **Effect of the Award of Social Security Benefits**

On August 27, 2003, eight months after MetLife reached its final decision on Evans' claim for LTD benefits, Evans' was found to be entitled to Social Security Disability benefits based upon her scoliosis. [Court File No. 16, A.R. 2-12]. Further, the ALJ's decision awarding benefits to Evans' found that she had "been under a 'disability,' as defined in the Social Security Act, since February 26, 2002." *Id.*, A.R. 9, ¶ 10.

In her memorandum in support of her motion for judgment on the administrative record, Evans' concedes that the Plan documents do not require MetLife to reopen her claim for LTD benefits under the Plan based upon the subsequent favorable Social Security Disability determination. [Court File No. 27, pp. 17-18]. However, she argues that: (1) the Plan does not prevent MetLife from reopening its decision and (2) that MetLife treats Social Security disability claims with great importance. [Court File No. 16, A.R. 203-04]. Evan asserts that under these circumstances, particularly, given the lengths to which MetLife goes to encourage persons seeking LTD benefits under the Plan to apply for Social Security disability benefits, MetLife should be estopped from refusing to consider the SSA benefits determination and that its refusal to reopen her claim for LTD benefits under the Plan in light of the Social Security Disability decision should be considered arbitrary and capricious.

As Evans correctly notes, the Plan documents describe in detail MetLife's Social Security assistance program. [Court File No. 16, A.R. 203-04]. First, the Plan documents set forth a lengthy list of reasons why persons seeking LTD benefits under the Plan should apply for Social Security disability benefits. *Id.* The Plan documents also set forth a lengthy description of how MetLife assists persons who are seeking LTD benefits under the Plan with the process of obtaining Social Security

disability benefits. *Id.*, p. 204. This assistance includes: a MetLife case management specialist who contacts the disability claimant, explains the application process and determines the best time to file a claim for Social Security Disability benefits; assistance from Social Security specialists throughout the Social Security claims process; assistance, when necessary, with reconsideration of an unfavorable decision by the Social Security Administration, a hearing before an ALJ, review by the Appeals Council, and an action for judicial review in federal district court; and referrals to attorneys, or vendors, who specialize in Social Security law. *Id.* Finally, Evans correctly notes that although MetLife has refused to consider the effect of the Social Security disability decision on her claim for LTD benefits under the Plan, MetLife has filed a counterclaim against her for overpayment of $2,576.97 based upon her receipt of Social Security disability benefits. [Court File No. 27, p. 19].

In *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516 (6th Cir. 2003), Darland applied for and was awarded Social Security disability benefits at Fortis' insistence. *Id.* at 529. Nevertheless, Fortis denied Darland's claim for LTD benefits. The Sixth Circuit held that where Fortis requested that Darland apply for Social Security disability benefits, its position was inconsistent. *Id.* at 530. Specifically, the Sixth Circuit stated:

> . . . Fortis requested that Darland apply for Social Security disability benefits so as to reduce the amount of monthly disability payments that it paid Darland under the plan . . . Moreover, after the Social Security Administration determined on July 8, 1998 that Darland was totally disabled as of July 15, 1996, Fortis then requested that Darland reimburse it for overpayment of insurance benefits, even though Fortis terminated payment of disability benefits to him under its policy on August 16, 1998 . . . it is totally inconsistent for Fortis to request that Darland apply for Social Security disability benefits, yet avail itself of that Social Security determination regarding disability to contend . . . that he is not disabled . . . Though not directly applicable in this case, the principles of judicial estoppel certainly weigh against Fortis taking such inconsistent positions.

*Id.* at 530.

Subsequent to *Darland*, however, the Supreme Court decided *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965, 155 L.Ed.2d 1034 (2004). Nord was a participant in the Black & Decker disability plan. *Id.* at 825-26. MetLife, the administrator of the plan, denied Nord's claim for LTD benefits and Nord brought an action in Federal District Court. *Id.* at 827. The district court granted a judgment for the plan, but the Ninth Circuit reversed, finding that ERISA plan administrators should follow a "treating physician rule." *Id.* at 828. The Supreme Court reversed, it noted that the "treating physician rule" was developed to control disability determinations by administrative law judges under the Social Security Act." *Id.* at 829.

The *Nord* Court held, however, that there were critical differences between Social Security disability programs and ERISA which cautioned against importing a treating physician rule from one to the other. *Id.* at 833. Thus, the *Nord* court held that courts could not require ERISA plan administrators to automatically accord special weight to a claimant's treating physician, nor may they impose on plan administrators any "discrete burden of explanation" when reliable evidence conflicting with a treating physician's evaluation is credited. *Id.* at 834.

Recently, in *Whitaker v. Hartford Life and Accident Ins. Co.*, 121 Fed. Appx. 86, 2005 WL 147076 (6th Cir. 2005), the Sixth Circuit stated that

> [f]ollowing the . . . decision in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965, 155 L.Ed.2d 1034 (2003) . . . this court held in an unpublished opinion that an ERISA plan administrator is not bound by an SSA disability determination. See *Hurse v. Hartford Life & Acc. Ins. Co.*, 77 Fed. Appx. 310 (6th Cir. 2003)(unpublished). There, this court recognized the incongruity of binding an ERISA plan administrator to the SSA's disability determination, when the SSA – but not the ERISA administrator – is bound by law to accord special deference to an claimant's treating physician.

*Id.*, 121 Fed. Appx. at 88, 2005 WL 147076 at * 2. The *Whitaker* court adopted the reasoning of *Hurse* and held that "an ERISA plan administrator is not bound by an SSA disability determination when

reviewing a claim for benefits under an ERISA plan." *Id.* Further, the *Whitaker* court also distinguished *Darland*, it noted that "*Darland* predates *Nord*, and was clearly based on application of the treating physician rule." *Id.*

Therefore, the Court finds that MetLife was not bound by the ALJ's Social Security Disability determination when reviewing Evans' claim for LTD benefits under the Plan. Moreover, MetLife's decision not to reopen Evans' claim for LTD benefits under the Plan and MetLife's counterclaim for reimbursement/recovery of an overpayment based upon Evans' receipt of Social Security disability benefits do not constitute grounds from finding that MetLife's termination/denial of Evans' claim for LTD benefits was arbitrary and capricious.

> **D.** **Whether the denial of disability benefits**
> **to plaintiff  was arbitrary and capricious**.

Evans contends that MetLife's decision denying/terminating her LTD benefits was arbitrary and capricious. Specifically, she contends: (1) MetLife's use of surveillance was arbitrary and capricious; (2) MetLife's reliance on the opinion/assessment of Dr. Hauge is arbitrary and capricious; and (3) MetLife's reliance on Kroger's willingness and ability to accommodate the limitations imposed by her thoracic scoliosis is arbitrary and capricious. [Court File No. 27, pp. 4-14]. MetLife, on the other hand, contends that its decision terminating Evans' LTD benefits as of December 21, 2002, was not arbitrary and capricious because its decision that Evans was no longer entitled to benefits under the terms of the Plan was reasonable and supported by substantial evidence in the administrative record. [Court File No. 28, pp. 1-2].

> **(1)** **MetLife's use of surveillance**

The Administrative Record contains a diary/message log kept by MetLife relating to Evans' claim for LTD benefits. [Court File No. 16, A.R. 159-172]. This diary/message log contains numerous

entries beginning on August 21, 2002 and ending on October 10, 2003. *Id.* One of these entries, dated

August 29, 2002, at 16:34 hours is of particular importance. *Id.*, A.R. 154. The entry states in pertinent

part:

> Incoming call from ER [Employer] S/W Doye and Donna (HR MGR)
> ER advised CM [Claims Manager] that several co workers have reported in the past
> few weeks that EE [Employee] has been observed, jet skiing, motorcycle riding and
> working on cars while OOW. ER also states EE has had some performance issues
> and if EE had not gone on STD [short term disability] she would have been
> transferred to a production position . . . .

*Id.*

Apparently in response to the telephone call informing the MetLife claims manager in charge

of Evans' claim for LTD benefits that several unidentified co-workers had allegedly reported that they

had seen Evans jet skiing, motorcycle riding and working on cars while off from work on short term

disability, MetLife decided to hire an investigator(s) to place Evans on surveillance. The investigators

reports appear in the record. [Court File No. 16, A.R. 50-53, 85-92, 120-126].

The first investigation report from Confidential Business Resources in Nashville, Tennessee,

is dated September 5, 2002. [Court File No. 16, A.R. 120-125]. The report summary states that Evans

was under surveillance on Saturday, August 31, 2002 and Sunday, September 1, 2002, between 8:00

A.M. and 4:04 P.M. *Id.*, A.R. 121. The report states that Evans was observed washing dishes through

her front window and sitting on her deck. The report also states that Evans: (1) was observed as she

carried three full back packs with her right hand, opened and closed the trunk of her vehicle with her

right hand and closing the door of a vehicle with her right hand. *Id.*

However, the surveillance portion of the report states that on Saturday, August 31, 2002, no

activity was observed by Evans. *Id.*, A.R. 122-23. The report for Sunday, September 1, 2002, states

in pertinent part:

-16-

**2:27 P.M.**     The unidentified male, female, three kids, two dogs and the claimant got into the Chevy Impala.   The claimant was carrying a bag in her right had along with wearing a backpack that was strapped around both shoulders.   She took a bag from a child sitting in the backseat of the vehicle and walked to the trunk of the vehicle.   She lifted the trunk open with her right hand and put the bag in the trunk using her left hand.   She repeated the same actions with another bag.   The claimant then placed her backpack into the trunk using her right hand and also shut the trunk with her right hand.   She then walked to the front passenger seat and sat down and with her right hand shut the car door . . . the vehicle drove off . . . .

*Id.,* A.R.  124.

In this instance, although the investigator's report states that he observed plaintiff carrying three full bags or backpacks, there is no explanation as to how the investigator knew the backpacks were "full," or what they contained.   Further, because two of the bags were taken from children in the Impala, the investigator does not state whether these were adult-sized or children-sized bags or backpacks.

The second   investigation report from Confidential Business Resources in Nashville, Tennessee, is dated September 30, 2002. [Court File No. 16, A.R. 85-92].   The report summary states that on Sunday, September 29, 2002, Evans exited her residence and drove to a residence in Delano, Tennessee.  *Id.*, A.R. 86.   After a minute, Evans exited the residence and was observed driving over "rural county roads from Delano to Athens, TN for approximately 42 minutes at very low rates of speed . . ." *Id.*   The report also notes that the investigator lost sight of Evans and spent the period from 2:00 to 4:05 P.M. "comb[ing] the Athens, TN shopping district, including Wal-Mart and K-Mart, local eating establishments, the movie theatre, local grocery stores, and area car washes, but was unable to obtain a visual on the subject." *Id.*, A.R. at 89.   Finally, the investigator's report also notes that when Evans was observed entering the driver's side of the pick-up truck, she was able to ". . . pull the door shut with her left hand in a fluid consistent manner." *Id.*, A.R. at 88.

-17-

The final investigation report from Confidential Business Resources in Nashville, Tennessee, is dated September 30, 2002. [Court File No. 16, A.R. 50-53]. The report summary states that during an eleven hour period on Sunday, October 20, 2002, and Monday, October 21, 2002, Evans was present in her residence, but was not observed outside the residence. On Monday, October 21, 2002, the investigator entered the Evans Performance automotive repair shop but did not observe the claimant within the shop or the office area. *Id.,* A.R. 51. Specifically, the report for Monday, October 21, 2002 states:

> **2:00 P.M.** Investigator entered the Evan [sic] Performance Automotive repair shop under pretext and observed the claimant's husband sitting at the only desk in the small office talking on the telephone. Investigator combed the office and small work shop area but did not observe the claimant on location . . .

*Id.*, A.R. 52-53.

In this instance, the results of the investigation/surveillance of Evans in August, September and October of 2002, A.R. 50-53, 85-92, 120-26, simply does not confirm the unsubstantiated employee reports that Evans had been observed jet skiing, motorcycle riding and working on cars while off work due to her scoliosis. Despite entering the automotive business run by Evans' husband, not only did the investigator fail to find Evans working on cars, but the activities they did find her engaged in – washing dishes, sitting on her deck, riding as a passenger in a pickup truck, opening and closing the door and trunk lid of a car and/or pickup truck, wearing and/or carrying a backpack or backpacks of unknown size and contents, and driving a pickup truck over country roads at a very low rate of speed – are substantially different, particularly in terms of the rigorous level of activity required, from jet skiing, motorcycle riding and repairing automobiles.

Moreover, beyond the surveillance of Evans, MetLife took no action to verify the claims of her fellow employees that they had observed Evans jet skiing, motorcycle riding and working on cars.

-18-

The names of the employees who allegedly observed Evans engaging in the aforementioned activity do not appear in the diary/message log nor anywhere else in the administrative record submitted by MetLife. Not only do the names of the Kroger employees who allegedly observed Evans jet skiing, motorcycle riding and working on cars not appear on the record, no evidence that anyone from MetLife, or Kroger/Peyton's, ever spoke with these employees and attempted to verify their stories appears in the record.

MetLife sent Evans a letter on October 22, 2002, informing her that her claim for LTD benefits had become payable as of September 15, 2002. *Id.*, A.R. 46-47. This letter does not mention either the claims of the Kroger employees concerning Evans' alleged activities or the results of the surveillance.

Subsequently, on December 17, 2002, MetLife sent Evans a letter informing her that her claim for LTD benefits had been approved for benefits from September 15, 2002, through December 21, 2002. *Id.*, A.R. 38. MetLife's letter discussed the reasons Evans' LTD benefits were being denied as of December 21, 2002. *Id.*, A.R. 39. Again, however, the letter does not discuss, or even inform Evans of the claims of other Kroger/Peyton's co-workers that she had been seen jet skiing, motorcycle riding or working on cars while off from work. *Id.* The letter also fails to mention either the fact that Evans was subject to surveillance/investigation or the results of such surveillance/investigation. *Id.*

Finally, on February 11, 2003, MetLife sent Evans a letter stating that it had completed its review of the termination of her LTD benefits on December 21, 2002, and that the claim determination was being upheld on appeal review. *Id.*, A.R. 13. Again, the letter does not mention either the claims of the Kroger employees concerning Evans' activities while off of work or the results of the surveillance of Evans. *Id.*, A.R. 13-15.

-19-

In its memorandum in support of its motion for a judgment on the administrative record, MetLife makes the following statement:

> Finally, at the same time [Evans] was claiming that she was incapable of working in a sedentary position, she was actively participating in very physically rigorous recreational activities. MetLife's Diary Review Report Entry dated August 29, 2002, reflects that several of Plaintiff's co-worker's at Kroger/Peyton's had observed her jet -skiing, motorcycle riding and working on cars while off work.  Obviously, Plaintiff's recreational activities of jet-skiing, motorcycle riding, and working on cars belie her simultaneous claim that she was unable to work as an Inventory Control Supervisor and was Disabled under the terms of the Plan.  If Plaintiff could jet-ski and ride motorcycles, she could certainly work in the sedentary Inventory Control Supervisor position.  In fact, the record suggests that Plaintiff could work, she just did not want to.

[Court File No. 24, p. 21](emphasis in original)(internal citations omitted).

This argument on the part of MetLife makes it clear that MetLife did take into consideration the reports from Kroger/Peyton's employees, summarized in the August 29, 2002, diary entry that plaintiff had been observed jet skiing, motorcycle riding and working on cars.  More explicitly, in its response to Evans' motion for a judgment on the administrative record, MetLife argues that

> [t]he basis for [its] determination that [Evans] was no longer eligible for LTD benefits included the following . . .
>
> • Plaintiff's participation in physically rigorous activities such as jet-skiing, motorcycle riding, and working on cars, contemporaneous with her claim of Disability.

[Court File No. 32, p. 13](citations omitted).

Title 29 U.S.C. § 1133, which governs claims procedures under ERISA, provides that:

In accordance with regulations of the Secretary, every employee benefit plan shall –

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

-20-

(2) afford a reasonable opportunity to any participant whose claims for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

*Id.* See also *Nord*, 538 U.S. at 825 ("ERISA and the Secretary of Labor's regulations under the Act require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials.")(citing 29 U.S.C. § 1133; 29 C.F.R. § 2560.503- 1(2002)).

Further, 29 C.F.R. § 2560.503-1 states in pertinent part:

*(g) Manner and content of notification of benefit determination.* (1) . . . the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination . . . The notification shall set forth, in a manner calculated to be understood by the claimant –

(i) The specific reason or reasons for the adverse determination . . . .

29 C.F.R. § 2560.503-1(g). Further, the regulation dealing with benefit determinations on review states:

*(j) Manner and content of notification of benefit determination on review.* The plan administrator shall provide a claimant with written or electronic notification of a plan's benefit determination on review . . . In the case of an adverse benefit determination, the notification shall set forth, in a manner calculated to be understood by the claimant –

(1) The specific reason or reasons for the adverse determination . . . .

29 C.F.R. § 2560.503-1(j).

Thus, MetLife relied on uncorroborated evidence that Evans was engaging in rigorous physical activity while she was off from work for disability. MetLife failed to determine the identity of the co-workers who allegedly observed Evans in this rigorous physical activity. Moreover, the surveillance/investigation which was undertaken at MetLife's behest after reports she had been involved in rigorous physical activity, did not substantiate such claims, or even determine the identity of the co-workers making such claims. Finally, although MetLife's pleadings before this Court admit that it relied on the claims that Evans had been observed in rigorous physical activity as a basis for

-21-

denying/terminating her LTD benefits under the Plan as of December 21, 2002, MetLife never notified Evans of this evidence in any of it letters discussing its grounds for the denial/termination of her claim for LTD benefits.

Accordingly, the Court finds that MetLife's denial/termination of LTD benefits was arbitrary and capricious. Not only did MetLife rely on uncorroborated/unsubstantiated claims that Evans was engaging in rigorous physical activity, but, contrary to the provisions of ERISA and the Secretary of Labor's regulations under the Act, MetLife failed to inform Evans that the alleged claims that she was engaging in rigorous physical activity while off from work were part of its reasons for denying/terminating her claims for LTD benefits.

### (2) MetLife's reliance on the opinion/assessment of Dr. Hauge

Evans contends that MetLife's reliance on the opinion/assessment of Dr. Hauge as grounds for the denial/termination of her LTD benefits under the plan was arbitrary and capricious. [Court File No. 27, pp. 9-11].

Evans filed her claim for LTD benefits under the Plan on July 22, 2002. [Court File No. 16, A.R. 137]. In her Disability Claim Employee Statement she indicated that her treating physicians were Dr. Donald Watters and Dr. David Fardon. *Id.*

Thereafter, on September 10, 2002, Dr. Watters completed an Attending Physician Statement in which he indicated that Evans could sit for four hours intermittently, stand for two hours intermittently, walk for one hour intermittently, should not climb/twist/bend/stoop or reach above shoulder level. *Id.*, A.R. 103. Dr. Watters also indicated that Evans could occasionally lift up to 20 pounds, but never lift more than 20 pounds. *Id.* Finally, Dr. Watters indicated that Evans could work a total of zero (0) hours per day and could not perform her duties because she was awaiting surgery due to the progression of her scoliosis. *Id.*

On September 9, 2002, Evans was examined by Dr. David Hauge.  As a result of his physical examination, Dr. Hauge found a "moderate to severe degree of paraspinous muscle spasm with a right dextroscoliosis." *Id.*, A.R. 96.  Dr. Hauge also found that Evans "can bend over at most 30°;" and that her gait was "distinctly analgic" – meaning that she had a posture or gait which was assumed to lessen pain.[1]  Dr. Hauge also reviewed multiple lumbar spine films and an MRI.  *Id.*, A.R. 98.  His diagnosis was that Evans had "a progressive lumbar dextroscoliosis . . ." *Id.*  Dr. Hauge also stated:

> I have advised this patient that no one in our neurosurgical practice routinely correct adult scoliotic deformities.  I think she is in good hands with Dr. Fardon and group . . . given the fact that I am not expert in correction of adult deformity scoliosis . . . I really have nothing else to offer this patient at this time.   I do feel that she is in good hands with Dr. Fardon and his group however.

*Id.*, A.R. 98.

Thereafter, on October 18, 2002, Evans records were reviewed by Dr. Mark A. Moyer, who concluded:

> The records provided for review support a history of chronic thoracic scoliosis with resultant thoracic pain as well as lumbar pain . . . this persons case can be thought of as similar to those typically seen with sciatica.   Persons with sciatica . . . are commonly able to perform at a sedentary or sedentary to light level with avoidance of prolonged sitting, standing or walking while working at their own pace so that changes of position can be afforded on an as needed basis.   The records provided would support that this person would also reasonably be restricted to sedentary to light work where she may lift up to 20 pounds occasionally, but should alternate between sitting, standing and walking for pain relief and comfort.   The records provided would not support that this person is incapable of doing any type of work, however, the medium level of work described in her current job description may not be reasonable under the circumstances.

*Id.*, A.R. 55.

Further, a letter from Dr. Hauge appears in the record which states:

---

[1]Definition of Antalgic – The Molson Medical Information Project – www.mmi.mcgill.ca

In response to your . . . regarding Julie A Evans . . . I have reviewed the one visit she had with us on September 9, 2002. I have also reviewed the report by Dr. Mark Moyer of your independent physician consultant board. I certainly concur with the diagnosis and with the work restrictions in this patient. I would state that certainly the patient's restrictions in the unoperated state, would probably be best kept at sedentary rather than light. She is physically capable of doing light work with 20 pounds occasional lifting but the less lifting and bending the better in a patient with this degree of scoliosis in the unoperated state. I would concur that the medium level work is probably not in her best interest and I would not recommend this.

Overall, I concur with Dr. Moyer's recommendations . . .

*Id.*, A.R.. 43.

Subsequently, a letter from Dr. Watters, dated December 24, 2002 appears in the record. Dr.

Watters record states:

The last letter I sent you regarding Julie Evans' ability to perform sedentary work, you were informed that the patient was under the care of Dr. David Hauge. He was unable to care for her severe progressive scoliosis because of his fear that the patient could suffer a permanent paralyzes [sic]. He felt he was not qualified to treat her. The patient was referred back to me with instructions to dispense enough medication to make her pain comfortable because they could not do anything at the present time.

I have found in saggital [sic] images on Ms. Evans demonstrates considerable lumbar dextroscoliosis centered at approximately L1-2. There is disc space narrowing at L3-4. Disc space narrowing and degenerative end plate changes at L1-2 . . . At L3-4 there is diffuse disc bulge. At L4-5 and to a lesser extent L3-4 with foraminal narrowing . . .

In summary, certainly at present Mrs. Evans is totally disabled and unable to work. It is however, my hope that in the future, that with appropriate medical treatment she can return to work in some capacity.

*Id.*, A.R. 34.

Thus, a review of the record shows that Dr. Hauge's opinion/assessment of Evans' capacity

to engage in work, Dr. Moyer's opinion/assessment of Evans' capacity to engage in work; and Dr.

Watter's Attending Physician Statement of September 10, 2002, A.R. 43, 55, 103, are all similar in that

they would limit, *inter alia*, Evans' functional capacity to some sedentary or light work which did not

involve lifting more than 20 pounds occasionally.   Further, all three physicians placed limitations on Evans' ability to sit, stand and walk and all three physicians indicated that Evans could not return to her former position at Peyton's/Krogers because that position involved medium work.  *Id.*

Only, Dr. Watters indicated that Evans' had no capacity to work at all.   However, because MetLife life as the ERISA plan administrator was not bound to accord greater weight to the opinion/assessment of Dr. Watters as Evans' treating physician, *Whitaker*, 121 Fed. Appx. at 88, 2005 WL 147076 at * 2, the Court concludes that MetLife's reliance on Dr. Hauge's opinion/assessment was neither arbitrary nor capricious.

> ### (3)  MetLife's reliance on Kroger's willingness/ability to accommodate the limitations imposed byEvans' scoliosis

Evans contends that MetLife's reliance on Kroger's willingness and ability to accommodate the limitations imposed by Evans' thoracic scoliosis is arbitrary and capricious. [Court File No. 27, pp. 4-8].     Specifically, Evans' contends that the accommodation offered by Kroger/Peyton's to her position as an Inventory Control Supervisor ignored the well-documented restrictions to her ability/functional capacity to engage in work. *Id.*, pp. 5-6.

The record contains a job description of Evans' position with Kroger/Peyton's completed by Warren Varnell, Production Manager on August 6, 2002. [Court File No. 16, A.R. 133].   The job description states that Evans' position involved one to two hours sitting per shift, three to four hours standing per shift, one to two hours walking per shift, one to two hours bending per shift, one to two hours twisting per shift, one to two hours crouching/stooping per shift, one to two hours kneeling per shift and one to two hours pushing or pulling per shift.  *Id.*   The job description also indicated that plaintiff would have to lift and/or carry up to 10 pounds occasionally, *i.e.*, 1- 33% of the time; lift 11-20 pounds occasionally; and lift and/or carry 21 to 50 pounds occasionally.  *Id.*   Finally, the job

description also indicates that in the course of performing her job Evans would have to be around moving equipment and/or machinery, be exposed to marked changes in temperature; and that overtime was required on a routine basis in Evans' position.

In addition, a Disability Claim Employer Statement was completed by Doye Miller, Benefits Manager at the Kroger Company on August 14, 2002. *Id.*, A.R. 132. The Statement indicates that Evans' position can be modified; and, it specifically indicates that "standing, sitting lifting can be modified as necessary." *Id.* Finally, the Statement also indicates that the possibility of her return to work had not been discussed with Evans. *Id.*

On December 17, 2003, Kroger sent an E-mail to MetLife indicating that it had a position available for Evans. The E-mail states in pertinent part that:

> We would be pleased to have Julie return to the Inventory Control Supervisor position on Third Shift immediately.
>
> It is a sedentary position in an office setting. The hours are 10:00 PM to 6:30 AM Sunday through Thursday – a 40 hour work week.
>
> I understand there is a lifting restriction of 20 pounds. Normal work requirements for the supervisor in that department should not require lifting any heavier than a computer print-out report. There are hourly employees who can do any lifting she feels is beyond her capability/restriction.

*Id.*, A.R. 40.

First, Kroger's description of the Inventory Control Supervisor position as ". . . sedentary position in an office setting . . .", *id.*, is markedly at odds with the Production Manager Varnell's job description of the position. *Id.*, A.R. 133. Varnell basically described the position as medium work, since it occasionally involved lifting 21 to 50 pounds. *Id.* In his November 20, 2002, letter Dr. Hauge stated that he concurred with Dr. Moyer that "medium level work is probably not in [Evans] best interest and I would not recommend this." *Id.*, A.R. 43. Moreover, Dr. Moyer was more specific he

-26-

stated that " . . . the medium level work described in [Evans] current job description may not be reasonable under the circumstances." *Id.*, A.R. 55.

Further, the Kroger E-mail indicates, at least to some extent, that Kroger was willing to accommodate the lifting restriction imposed by Evans' scoliosis. However, in his assessment, Dr. Watters also indicated that Evans should not climb, twist, bend or stoop. *Id.*, A.R. 103. Dr. Hauge essentially concurred in this restriction when he stated in his November 20, 2002 letter that Evans was ". . . physically capable of doing light work with 20 pounds occasional lifting *but the less lifting and bending the better in a patient with this degree of scoliosis . . .*" *Id.*, A.R. 43 (emphasis added). Production Manager Varnell's job description of Evans' position with Kroger/Peyton's indicated however that her position involved one to two hours bending per shift, one to two hours twisting per shift, and one to two hours crouching/stooping per shift. *Id.*, A.R. 133. Moreover, the Disability Claim Employer Statement completed by Kroger Benefits Manager Doye Miller indicated that the standing, sitting and lifting aspects of Evans' position could be modified. *Id.*, A.R. 132. Miller's Statement, however, does not indicate that the bending, twisting and crouching/stooping aspects of Evans' position were modifiable. *Id.*

Finally, Production Manager Varnell's job description indicates that overtime was required on a routine basis in Evans' position. *Id.*, A.R. 133. None of the assessments from Drs. Watters, Hauge and Moyer discuss whether Evans could perform overtime on a routine basis given the limitations imposed by her degree of scoliosis. However, Dr. Moyer did state that Evans condition could be likened as similar to individuals with sciatica and that:

> [p]ersons with sciatica and low back pain are commonly able to perform at a sedentary or sedentary to light level with avoidance of prolonged sitting, standing or walking while working at their own pace so that changes of position can be afforded on an as needed basis.

*Id.*, A.R. 55.   While not explicitly addressing the question of Evans' ability to routinely perform overtime, Dr. Moyer's statement that Evans would need to avoid prolonged sitting, standing or walking while working at her own pace, strongly suggests that her scoliosis would produce some limitation/restriction on Evans' ability to routinely work overtime.   Kroger's E-mail offering an accommodation of Evans position of an Inventory Control Supervisor does not offer to accommodate the need for routine overtime.   *Id.*, A.R. 40.

Accordingly, the Court concludes that because Kroger's offer to accommodate the restrictions/limitations imposed by Evans' scoliosis addresses only the limitations on Evans' ability to lift more than 20 pounds, but not the limitation on Evans' ability to bend, twist and crouch/stoop found by Drs. Watters and Hauge, MetLife's termination/denial of Evan's LTD benefits as of December 21, 2002 was arbitrary and capricious.   Moreover, because Kroger/Peyton's offer of an accommodation does not address all of the limitations imposed by her scoliosis on Evans' ability to perform the duties of the Inventory Control Supervisor position, MetLife's acceptance of Kroger's offer to accommodate the lifting restriction imposed by Evans' scoliosis was arbitrary and capricious.

Therefore, for the reasons set forth in considerable detail above, the Court finds that MetLife's decision to terminate/deny LTD benefits under the Plan to Evans as of December 21, 2002, is not supported by substantial evidence in the administrative record and is arbitrary and capricious. Accordingly, Evans' motion for a judgment on the administrative record [Court File No. 26] will be **GRANTED** and MetLife's motion for a judgment on the administrative record [Court File No. 28] will be **DENIED**.

> **E.      Whether Evans' scoliosis is a pre-existing condition as
> defined by the Plan / Whether Evans' scoliosis is limited
> to a 24-month period of LTD benefits under the Plan**

Evans contends: (1) her scoliosis is not a pre-existing condition as defined by the Plan [Court File No. 27, pp. 16-17]; and (2) that LTD benefits for her scoliosis are not limited to a 24-month period by the Plan documents [Court File No. 27, p. 17]. As noted previously, the Plan documents give MetLife discretion to interpret the terms of the plan and determine eligibility for benefits under the Plan. [Court File No. 16, A.R. 210].

A review of MetLife's denial letters reveals that MetLife's denial/termination of Evans' claim for LTD benefits was not predicated upon either the ground that her scoliosis was a pre-existing condition under the Plan or that benefits for her scoliosis were limited to a 24-month period under the Plan. Had MetLife exercised its discretion to interpret the terms of the Plan and determine Evans' eligibility for benefits under the Plan to make either, or both, of the aforementioned determinations, under ERISA, this Court would be able to review MetLife's exercise of discretion to determine if it was an abuse of discretion. However, MetLife, as the ERISA plan administrator, has not exercised its discretion to determine either that Evans' scoliosis is a pre-existing condition under the Plan, or that benefits, if any, under the Plan for her scoliosis are limited to a 24-month period.

Thus, as the Court has before it no decision by the Plan administrator with regard to these two issues, the court cannot perform judicial review of the administrator's exercise of discretion to determine if the exercise of discretion was arbitrary and capricious. Furthermore, because the Plan documents give MetLife, as the Plan administrator, the discretion to make the aforementioned decisions, the Court will resist Evans' invitation to exercise its judgment/discretion in lieu of the ERISA plan administrator. Accordingly, the Court concludes that the issues as to whether or not Evans' scoliosis is a pre-existing condition under the Plan or whether the Plan limits benefits for her scoliosis to a 24-month period are not properly before this Court in this action.

### F.     Whether Evans owes MetLife reimbursement

**for an overpayment based upon her subsequent
receipt of Social Security Disability benefits**

As previously noted, in its Amended Answer [Court File No. 17] MetLife has asserted a counterclaim against Evans alleging that it overpaid her $2,567.97 in LTD disability benefits under the Plan as a result of the award of retroactive Social Security Disability benefits. As part of her claim for benefits under the Plan, Evans did sign an agreement to reimburse MetLife for any overpayment of LTD benefits resulting from the payment of Social Security Disability benefits. [Court File No. 16, A.R. 138]. As previously noted, MetLife paid Evans LTD benefits under the Plan for the period from September 15, 2002 through December 21, 2002. As also previously noted, the Social Security Disability decision of August 27, 2003, awarded Social Security Disability benefits to Evans retroactive to February 26, 2002. [Court File No. 16, A.R. 9]. Thus, as Evans did subsequently receive retroactive Social Security Disability benefits which cover the period from September 15, 2002 through December 21, 2002, MetLife is entitled to a reimbursement for an overpayment based upon Evans subsequent receipt of Social Security Disability benefits for that same period.

However, because this Court has already determined, *supra*, that MetLife acted arbitrarily and capriciously in terminating Evans LTD benefits under the Plan as of December 21, 2002, MetLife also owes Evans additional accrued benefits from December 21, 2002. The Court sees no reason why MetLife cannot offset the $2,526.97 reimbursement offset resulting from the retroactive award of Social Security Disability benefits from the additional/accrued LTD benefits which it now owes Evans under the Plan beginning December 21, 2002.

Accordingly, MetLife's counterclaim against Evans for $2,567.97 in overpayments of LTD disability benefits under the Plan as a result of the award of retroactive Social Security Disability benefits [Court File No. 17, 21] will be **GRANTED in part** and **DENIED in part** as follows:

-30-

(1)     To the extent that MetLife seeks recovery from Evans for $2,567.97 in overpayments of LTD disability benefits, MetLife's counterclaim for reimbursement [Court File No. 17, 21] will be **GRANTED in part**; but

(2)     To the extent that MetLife asserts that no additional LTD benefits are due and owing to Evans under the Plan and MetLife seeks immediate repayment of the $2,567.97 from Evans, MetLife's counterclaim [Court File No. 17, 21] will be **DENIED in part**.  As noted in the Court's discussion, *infra*, MetLife can and should recover the $2,567.97 in overpayment by offsetting the amount from the additional LTD benefits now due and owing to Evans under the Plan.

## IV.     <u>Conclusion</u>

The Court having concluded that MetLife's termination of Evans' LTD benefits under the Plan was also arbitrary and capricious, MetLife's December 21, 2002, termination of long term disability benefits to Evans on the ground that Evans had not provided medical documentation of continuing disability under the Plan [Court File No. 16, A.R. 13-15] will be **REVERSED**.

Further, MetLife's motion for a judgment on the administrative record [Court File No. 28] will be **DENIED**; and, Evans' motion for a judgment on the administrative record [Court File No. 26] will be **GRANTED**.

 In addition, MetLife's counterclaim for reimbursement of $2,576.97 in LTD benefits on the ground that it overpaid Evans under the plan based upon the award of retroactive Social Security Disability benefits [Court File No. 17, 21] will be **GRANTED in part** and **DENIED in part** as follows:

(1)     To the extent that MetLife seeks recovery from Evans for $2,567.97 in overpayments of LTD disability benefits, MetLife's counterclaim for reimbursement [Court File No. 17, 21] will be **GRANTED in part**; but

(2)     To the extent that MetLife asserts that no additional LTD benefits are due and owing to Evans under the Plan and MetLife seeks immediate repayment of the $2,567.97 from Evans, MetLife's counterclaim [Court File No. 17, 21] will be **DENIED in part**.  As noted in the Court's discussion, *infra*, MetLife can and should recover the

-31-

$2,567.97 in overpayment by offsetting the additional LTD benefits now due and owing to Evans under the Plan.

A separate order will enter.

_____/s/ R. Allan Edgar_____
R. ALLAN EDGAR
CHIEF UNITED STATES DISTRICT JUDGE